(Decided 1st July, 1874.)

---

## CHARLES H. McBLAIR *vs.* FRANK A. BOND.

*Removal from Office of the Adjutant General, under Art. 9, sec. 2 of the Constitution—Tenure of the Office of the Adjutant General—Removal of the Adjutant General during the recess of the Senate.*

By Art. 9, sec. 2 of the Constitution of 1867, it is provided that there shall be an Adjutant General appointed by the Governor, by and with the advice and consent of the Senate; and that "he shall hold his office until the appointment and qualification of his successor, or until removed in pur-

suance of the sentence of a Court-martial." Under this provision of the Constitution the Adjutant General may be removed from office simply by the appointment and qualification of a successor, without the sentence of a Court-martial having been pronounced against him; such appointment being made by the Governor with the concurrence of the Senate.

The Governor has no power under the Constitution of 1867, as he had under the Constitution of 1864, at his own mere will and pleasure, to remove from office the Adjutant General; but with the concurrence of the Senate, a successor may be appointed, and upon the qualification of the appointee the incumbent's right to hold will *eo instanti* terminate.

The language in Art. 9, sec. 2 of the Constitution, that the Adjutant General "shall hold his office until the appointment and qualification of his successor," must be taken by its own force, as prescribing the tenure by which the office is to be held.

During the recess of the Senate the Governor alone has the power to remove the Adjutant General in pursuance of the sentence of a Court-martial: and upon such removal, he has power under sec. 11 of Art. 2 to fill the vacancy thus created until the end of the next session of the Senate, or until another appointment be made as authorized by the Constitution.

APPEAL from the Circuit Court for Anne Arundel County.

On the 23rd of April, 1874, the appellant filed his petition, alleging that on the 8th of February, 1871, during the recess of the Senate, he was appointed by the Governor, Adjutant General to fill a vacancy in the office occasioned by the resignation of George H. Bier, was commissioned and duly qualified, and entered upon the discharge of his duties; that afterwards on the 5th of January, 1872, the petitioner was nominated to the Senate by the Governor and confirmed as Adjutant General; that subsequently on the 5th of February, 1872, he was again nominated by the Governor and confirmed by the Senate as Adjutant General, and on the 12th of April following, he qualified by taking and subscribing the oath prescribed by the Constitution and laws of the State: that from the time he first entered upon the duties of his office, he continued to per-

form the same without let, hindrance or molestation until the 4th of April, instant, when the appellee presented himself in the official chamber of the Adjutant General, and claimed from the petitioner the possession thereof, and of the office of Adjutant General, alleging that he had been appointed Adjutant General by the Governor; that the petitioner thereupon refused to surrender possession of the said official chamber or of the office of Adjutant General to the appellee, and refused to recognize his claims and pretensions; that on the 8th of April, instant, the petitioner on reaching the official chamber of the Adjutant General found the doors locked, and upon inquiry learned from the appellee who was not occupying said chamber, but was in an adjoining office, that they had been locked by his directions, and he positively refused to allow the petitioner admission to the said chamber; that for several days the appellee kept the doors locked positively refusing to allow the petitioner to have access to the chamber, or to the books or archives of the office of Adjutant General, so that he could properly perform the duties thereof; that afterwards the appellee himself occupied the said chamber, claiming to act as Adjutant General and to have the right so to do; that the appellee continues to occupy said office and refuses to allow the petitioner to occupy the same. The petition further charged that the intrusion of the appellee as aforesaid, and his possession of the archives belonging to the office of the Adjutant General were usurpations not warranted by the Constitution and laws of the State, and his claim and pretence to act as Adjutant General were illegal; that the petitioner by virtue of his appointment, commission and qualification as aforesaid, became entitled to hold the said office as a military officer, and the Governor had no right to remove him therefrom except in pursuance of the sentence of a court-martial; that he had not been tried, convicted or sentenced by any Court-martial, nor removed by the Governor in pursuance

of any judgment or sentence of a Court-martial; and that therefore the appellee had no right to the office of Adjutant General under any pretended appointment by the Governor, but that the petitioner was the Adjutant General, and as such entitled to the possession of the said chamber and to the custody of the archives, books, &c. belonging thereto and to the office of Adjutant General, and to the emoluments thereof.

The petition prayed that the appellee might be required to show cause why a writ of mandamus should not be issued, commanding him to surrender to the petitioner the office of Adjutant General, together with the books, property, &c., thereto belonging.

The appellee, on the 5th of May, answered admitting that the petitioner was appointed and qualified as Adjutant General, and that under this appointment and qualification he assumed to discharge the duties of said office, and so continued until the appointment and qualification of the respondent; but the respondent denied that the appointment and qualification of the petitioner gave him any rightful authority to hold said office and perform the duties thereof; and averred that the petitioner was a commissioned officer of the United States Navy, before and at the commencement of the late war between the United States and the so-called Confederate States, and as such had taken an oath to support the Constitution of the United States; that he left the service of the United States, and became an officer of the Navy of the said Confederate States, then being at war with, and in arms against the United States, and as such officer, engaged in insurrection and rebellion against the Government and authority of the United States; by reason whereof, the said petitioner was at the times of his appointments aforesaid, as Adjutant General, disqualified under the Constitution of the United States, and incapable of holding any office, civil or military, under the United States or under

any State; and so the said petitioner was at the times of his said appointments, and from thence continuously until, and subsequent to, the appointment and qualification of the respondent as Adjutant General, disqualified by the Constitution of the United States to receive or hold the office of Adjutant General of the State of Maryland; and that said disqualification continued until his disability was removed by the Act of Congress, passed since the 8th of April, 1874.

The respondent further stated that on the 1st of April, 1874, he was nominated to the Senate by the Governor as Adjutant General, and on the 3rd of the same month, his nomination was duly confirmed by the Senate; and on the 4th of the same month he received from the Governor his commission, and duly qualified as such officer by taking and subscribing the prescribed oath; and that since the said 4th of April, he had been in the actual official possession of said office and its archives and properties, and had been recognized by the Governor as being in such possession.

The respondent admitted that on the 8th of April, he locked the doors of said office, and would not permit the petitioner to enter the chamber on any claim or pretence of right to do so as Adjutant General; and in explanation of his conduct in this particular, the respondent stated that the Governor notified him that he should hold him responsible for the performance of his official duties, and for the custody, preservation and safety of the archives of the office; and the respondent having reason to believe that the petitioner intended to enter the chamber and maintain possession, if necessary, by force, or to remove some of the books, so as to put the respondent to the necessity of commencing legal proceedings to assert his right to the office, he deemed it to be his duty, being in rightful possession himself, and to enable him to perform his duties, and meet his responsibility to the Governor,

to hold possession, and not allow any person to enter the office under any pretence of right to do so, as Adjutant General, and did on the 8th of April last, refuse the petitioner permission to enter the office, or to have access to the books, papers, &c., belonging thereto, as Adjutant General.

The respondent insisted that his acts had been in conformity with his rights, duties and obligations under the Constitution and laws, and were in no sense usurpations, not warranted by them; and he also denied the right of the petitioner to hold said office, after the appointment and qualification of the respondent; he also insisted that according to the Constitution of Maryland, the Governor had the authority to remove the petitioner from the said office, even if he had been qualified, and not disabled to hold the same by the Constitution of the United States, and conceding as the respondent did, that he had not been tried, convicted and sentenced by a court-martial, or removed by the Governor in pursuance of any such judgment or sentence; the respondent further averred that his appointment, commission and qualification were legal and valid, and operated the removal of the petitioner from said office and gave authority to the respondent to enter and take possession of the said office, and the archives pertaining thereto, and to discharge the duties of the said office.

The petitioner by way of plea to this answer, admitted that the respondent was nominated, confirmed and commissioned as Adjutant General, but denied that the said appointment, commission and qualification were legal and valid, and operated a removal of the petitioner from office; he also pleaded to the jurisdiction of the Court to inquire in this proceeding, into his alleged disqualification under the Constitution of the United States, to hold the office of Adjutant General growing out of the fact of his having been a commissioned officer in the Navy of the United States, and having become an officer in the Navy of the

McBlair *vs.* Bond.

Confederate States then being at war with, and in arms against the United States; he also averred that the statements in the answer in reference to the said pretended disqualification, were not sufficient in law to establish or constitute any such disqualification as in the said answer was imputed to the petitioner; and further, if he were at any time disqualified in the manner alleged, such disqualification and incapacity had been wholly removed by virtue of the Act of Congress referred to in said answer, to the same extent and effect as if such disqualification or incapacity had never existed, if the same ever did exist, which he denied. With this plea was filed a copy of the Act of Congress, approved 23 April, 1874, removing all political disabilities imposed upon the petitioner by the 14th Amendment to the Constitution of the United States, by reason of participation in the rebellion; with it there was also filed a copy of a letter to the petitioner from Col. J. F. Lee, formerly Judge Advocate General of the Army of the United States, a member of the State Convention that framed the Constitution of 1867, and chairman of the Committee on the Militia. From this letter it appeared that the writer who framed the constitutional provision which established the office of Adjutant General, was of opinion that such officer could be removed from office only by sentence of a court-martial, and that the writer endeavored so to express it in the language employed. To so much of said plea as denied that the Governor had the right to remove the petitioner from the office of Adjutant General, and that the appointment, commission and qualification of the respondent were legal and valid, and operated a removal of the petitioner from said office, &c., the respondent joined issue in law with the petitioner.

And to so much of said plea as referred to the averments in the answer, charging the disqualification of the peti-

tioner growing out of his having been a commissioned officer in the United States Navy and having become an officer in the Navy of the Confederate States, and insisted that the said matters could not lawfully be inquired of by this Court in this proceeding, the respondent, averring that the Court had jurisdiction, demurred.

And to so much of the plea as alleged that the statements in the answer in reference to said disqualification of the petitioner, were not sufficient in law to establish such disqualification as was imputed to him in the answer, the respondent joined issue in law with the petitioner.

And to so much thereof as averred that the disqualification of the petitioner, if any such ever existed, was removed by the Act of Congress referred to in the answer, the respondent stated that said Act of Congress was approved on the 23rd of April, 1874, and not before, and that the alleged disqualification and incapacity of the petitioner had not been wholly removed by virtue thereof.

The petitioner rejoined and the issues were made up.

The Circuit Court, (MILLER, J.) was of opinion that the petitioner could not be removed from the office of Adjutant General by the appointment of his successor by the Governor, by and with the advice and consent of the Senate; but was likewise of opinion that he was disqualified to hold the office, under the third section of the 14th Amendment of the Constitution of the United States, and that the Act of Congress which he claimed had removed such disqualification or incapacity had no retroactive operation. The Court thereupon passed an order directing the clerk to enter judgment for the defendant, and dismissed the petition with costs.

From this order the petitioner appealed.

The cause was argued before BARTOL, C. J., STEWART, GRASON, ALVEY and ROBINSON, J.

*S. Teackle Wallis* and *A. B. Hagner*, for the appellant.

Two questions are raised by these proceedings:

1. As to the constitutional power of the Governor and Senate to remove the appellant and nominate and confirm the appellee in his stead, and

2. As to the alleged ability of the appellant to hold office, under the 14th amendment of the Constitution of the United States; he having been an officer of the U. S. Navy, and having left it, to become an officer of the Navy of the Confederate States.

The first question naturally precedes the other; the capacity of the appellant to hold the office in dispute being of no importance, if he has been duly removed from it in conformity with the Constitution of the State.

1st. Then, as to the constitutionality of the appellant's removal.

Upon this point the appellant has the advantage of the unhesitating opinion of the able Judge below, (MILLER, J.,) who held it clear that the office of Adjutant General is not made by the Constitution dependent upon the pleasure of the Executive and Senate. Indeed, the point is rather suggested than pressed by the counsel of the appellee in their brief.

It is indisputable, as matter of fact, that no such power of removal was intended to be conferred on the Governor and Senate by the Constitution. This is made clear by the statement of the chairman of the committee by whom the constitutional provision in question was prepared and submitted to the Convention of 1867, (as appears from the letter of Col. J. F. Lee in the record, introduced without objection.) Himself a distinguished officer of the regular army, the chairman expressly, and as matter of military policy, endeavored by the clause in question, and with the approval of the Convention, to prevent the removal of the Adjutant General in any event, without the previous sentence of a court-martial. It is submitted that there ought to be no question of his having done so successfully.

Article IX., sec. 1 of the Constitution of 1867, relates to "Militia and Military Affairs." There was a corresponding Article of the same number and title in the Constitution of 1864. By section 3 of the latter Article it was provided: "There shall be an Adjutant General, who shall be appointed by the Governor, by and with the advice and consent of the Senate. *He shall hold his office at the pleasure of the Governor.*" Section 2 of the 9th Article of the present Constitution differs from this, only in the latter clause, which is altered to read as follows: "He shall hold his office *until the appointment and qualification of his successor, or until removed in pursuance of the sentence of a court-martial.*" What ever else this alteration may mean, it certainly means, that the Adjutant General shall no longer "hold his office at the pleasure of the Governor." That is beyond dispute. By whose pleasure, then, does he hold it? The 9th Article contains no intimation, and unless some such be found elsewhere, the Adjutant General, like all the other military officers of the State, without exception, must hold subject only to suspension for disobedience of orders, or other military offence, and to removal upon the sentence of a court-martial. (*Constit., Art.* 2, *sec.* 15.) An examination of the Constitution discloses no intimation of any sort, on the point, except so far as may appear by the provisions of Art. 2, concerning the "Executive Department." A careful scrutiny of that section also will show, that it contains nothing of the kind and nothing from which it can be inferred. By section 10, the Governor is authorized to "nominate, and with the advice and consent of the Senate, to appoint all civil and military officers of the State, where appointment or election is not herein provided for, unless a different mode of appointment be prescribed by the law creating the office." This differs in nothing from the special provision of Art. 1X. (touching the Adjutant General,) as to the mode of appointment, and by its terms

does not apply to his case, which the ninth Article provides for in that regard. Sec. 11 authorizes the Governor to fill " vacancies " (not to create them) during the recess of the Senate. Sec. 13 refers to civil officers only. Sec. 14 refers to " vacancies " during the session of the Senate. Section 15 contains the only provision bearing on the subject, and it is in these words : " The Governor may suspend or arrest any military officer of the State for disobedience of orders or other military offence, and may remove him in pursuance of the sentence of a court-martial." Not one other word beyond this, in the Constitution, any where, touches the subject of the removal of any military officers, or their tenure of office, and the purpose of this section to exclude the right of discretionary removal in regard to them, is made the more manifest by the fact, that it proceeds to authorize the Governor to remove, at his pleasure, for incompetency or misconduct, all *civil* officers who receive appointment from the Executive for a term of years. All other civil officers are subject to removal only in the mode specially prescribed, as to their respective offices, in the constitutional clauses which apply to them. In the plain absence then of any provision, particular or general, by which the Constitution authorizes or gives color to the removal of the Adjutant General by the Governor, or the Governor and Senate, no power to remove him can exist, in either or both, unless we are authorized to infer that the right to appoint a successor to any officer entitles the appointing power to remove him for the purpose. There is in the Constitution no such power, in this case, unless it is to be so implied—which is believed to be hardly within the range of reasonable contention. If the Convention intended to provide for the removal of the Adjutant General, otherwise than by sentence of court-martial, it has failed to do so, and no constitutional power, it is submitted, can be based on a *casus omissus.* The fact that there is no such provision, general or special, is, on the contrary, proof conclusive against the suggestion that any such

removal was contemplated. We are construing an instrument under which powers, to exist, must be granted, and are not to be implied or presumed, and it is no impeachment of the integrity, fidelity or intelligence of either the Executive or the Senate, to insist that they were not meant to exercise powers which are not conferred on them. There is no constitutional presumption in favor of their right to remove from office. They have no more right, without specific authority, to remove a Judge than a military officer, and there is just as much foundation for the doctrine of intendment or presumption in the one case as in the other, the Constitution withholding the power in both. (*Cantwell vs. Owens*, 14 *Md.*, 215.) The idea of a power to remove any officer, civil or military, vested in the Governor and Senate, is an absolute novelty in our entire constitutional history.

In this view, there is no *onus* on the appellant to explain in what cases (if any,) a successor of the Adjutant General was intended to be eligible, over and above those arising after the action of a Court-martial. The phrase, " he shall hold his office until the appointment and qualification of his successor," was probably only intended, as it is commonly meant, to prevent an interregnum in the office, in any contingency, such as resignation, disqualification, &c. But there is no case in which it can be held to confer the power to prevent the Adjutant General from continuing to hold his office by appointing a successor with that object. It cannot mean that the authority to fill a vacancy involves the right to create it.

Nor is there any force in the suggestion, that the appellant's construction would make the Adjutant Generalship a life office. Every Major General and Brigadier holds during good behaviour, why not the Adjutant General? The fact that he alone receives a salary, can hardly alter a principle of constitutional construction or public policy. He is a military officer like the rest. On what principle should he hold by a different tenure from the rest? The

people are not jealous of the militia, but of executive control over the militia. It is this that is dangerous. It was to prevent this, that the Constitution of 1867 altered the provisions of that of 1864, and took away from the Governor the power of removal, which made the Adjutant General, and through him, the whole militia, subservient to the Executive. Nor is there any more disposition on the part of the people to subordinate the militia, through its chief officer, to the Senate than to the Governor. The government of the militia belongs to the Legislature, the whole representative of the people—not to the Executive and the quasi-executive department. The 1st section of Art. IX., asserts this control of "The General Assembly" over the whole subject, in terms, and the Senate was no more intended than the Governor, to control the mainspring of its administration and efficiency.

The clause of the original Constitution of the State, limiting the power of removing military officers to cases upon which Court-martials had previously acted, was expressly suggested by the experience of the English people, and by well founded jealousy of executive control over the civic military arm. A copy of the first Constitution of Maryland annotated by the late learned Chancellor BLAND, (in the possession of Mr. Hagner,) recalls this fact, by reference to 12 *Belsham's History of Great Britain*, 446.

The occasion especially referred to by the historian is that occurring under George II, when Lord Morpeth moved in Parliament to prevent the removal of certain militia officers, otherwise than " by judgment of a Court-martial, or address of either house of Parliament." The Government defeated the motion but its defeat only served to endear the principle still more to the liberal opposition and the people.

The experience of the last fifteen years in our own country, would not seem to indicate that there is any better reason, now, than ever, for making the militia dependent, directly or indirectly, on executive control or patronage.

The argument that the words " during good behaviour " would have been used, if the thing had been intended, amounts to nothing, for all military officers do hold by that tenure, and yet the words are not used in regard to them.

*James Revell* and *William H. Tuck,* for the appellee.

The Constitution, Art. 9, sec. 2, provides: " There shall be an Adjutant General appointed by the Governor, by and with the advice and consent of the Senate. He shall hold his office *until the appointment and qualification of his successor,* or until removed in pursuance of the sentence of a Court-martial." But the Court is not confined to this clause in ascertaining the tenure of this officer. The whole instrument must be considered, and effect given to every part, for each word or sentence is supposed to have been used for a purpose, and the language is to be interpreted according to the sense which the people may be presumed to have put upon it. *Mace's Case,* 5 *Md.,* 337; *Manly's Case,* 7 *Md.,* 135.

The Constitution of 1851 fixed the term at six years; that of 1864, " at the pleasure of the Governor." Art. 9, sec. 3.

If it be said that the Convention of 1867, by leaving out these words, intended to deprive the Governor of all power over the appointment, so as to make it a life office, it may be asked why did they not employ words as expressive and clear of doubt as those omitted. That they did not mean to create a life office, is very clear from the clause subjecting the incumbent to removal by sentence of a Court-martial. If the intent was such as is supposed, in behalf of the appellant, it was quite easy for that body not to have used the words, " until the appointment and qualification of his successor," and left the clause to read, " he shall hold his office until removed in pursuance of the sentence of a Court-martial." Then the meaning would have been plain, and no removal could have taken place except

in the manner provided. Hence no argument can be based on the circumstance of certain words having been omitted from the Constitution of 1864, which cannot be as well enforced for *not* inserting others in that of 1867.

What are we to suppose the people understood by the words, "until the appointment and qualification of his successor?" They import that at some time, under some state of circumstances, a successor might be appointed, and that the incumbent should hold over until that appointee could qualify. Now, in what state of case could that happen? Was it intended by the people, that after the Adjutant General had been tried, convicted and removed by sentence of a Court, he should still hold the office until another person could be appointed and qualified. Surely not, for a man out of place cannot perform its duties, to say nothing of the shame of so continuing one degraded in the judgment of his fellow officers.

It cannot apply to vacancies by death, or removal beyond the State, nor to resignations, because in all these cases the party would be out of office, and could not hold until the qualification of a successor.

Under the Constitution of 1864, this officer held "during the pleasure of the Governor," but a new appointment during the recess, like all others, would continue only until the session of the Senate, when the powers of that body were to be invoked in confirming that, or in making a new appointment. Original appointments and vacancies were provided for by *secs*. 13, 14, *of Art.* 2, as they are by the present Constitution, *Art*. 2, *secs*. 10, 11. But in both instruments—1864, *Art*. 2, *sec*. 17; 1867, *Art*. 2, *sec*. 15—the Governor is authorized to suspend or arrest any military officer, and may *remove* in pursuance of the sentence of a Court-martial. So that the power of removal, after sentence, need not have been conferred by Art. 9, sec. 2 of the present Constitution. Their insertion in that section are of no special significance, except to shew that

the power of removal was not to rest only with the Governor and Senate, but that as before provided under sec. 15 of Art. 2, the efficiency of the militia might be promoted by making this officer, as all others, subject to trial by Court-martial.

Under the Constitution of 1864, the Governor might have removed; under the present, he cannot, without the concurrence of the Senate in the new appointment. It might have been well doubted whether the Adjutant General was at all subject to trial and sentence by a Court-martial, under the Constitution of 1864, because the limitation of his term, in Art. 9, by the pleasure of the Governor, without connecting it with removal by sentence of a Court, as is done in the present Constitution, might imply a purpose to except this officer from the operation of the general words used in sec. 17, Art 2; for how could he be said to hold at the pleasure of the Governor, if others might prefer charges and have him tried and removed on conviction. The judgment of a Court-martial might, at any time, interfere with the discretion of the Governor, and the tenure would no longer be *durante bene placito.*

If it should be decided, that under the present system, this officer may be tried, convicted and removed, in pursuance of the sentence of a Court-martial, and that the *Governor and Senate* may remove him by a new appointment, effect will be given to each clause of sec. 2, Art. 9, without doing violence to any other provision of the Constitution; when appointed, he is to hold until one of two things shall happen—the appointment and qualification of another person, *or* his removal in pursuance of the sentence of a Court-martial. Whichever may first occur, will terminate his term, and that construction which subjects him to both modes of removal, will, best accomplish the purpose of the Convention in framing this Article as we find it.

[The argument of counsel on the effect of the 14th Amendment of the Constitution of the United States on the controversy is omitted, the Court not having considered that point in its opinion and judgment. Rep.]

ALVEY, J. delivered the opinion of the Court.

This is an appeal from a judgment of the Circuit Court for Anne Arundel County, refusing to the appellant the writ of *mandamus* to restore him to the office of Adjutant General of the State, of which, as he alleges, he has been wrongfully and unlawfully dispossessed by the appellee.

The facts of the case are all disclosed in the pleadings, and the questions thereon are raised by demurrer.

The case has been argued with rare ability by the counsel of the contestants, and every argument has been urged in support of their respective positions that ingenuity could suggest. Several questions of grave importance have been discussed, but in the view we have of the case, it will not be necessary to decide more than one of the questions raised on the pleadings; and that question is, whether the appellant was liable to be removed from the office of Adjutant General, to which he had been legally appointed, simply by the appointment and qualification of a successor, without the sentence of a court-martial having been pronounced against him; it being admitted that the appellee, during the last session of the Legislature, was appointed to the office by the Governor, by and with the advice and consent of the Senate, and that, after being commissioned, and having qualified, he entered the office and excluded the appellant from the further discharge of its functions.

This question depends for its solution upon the proper construction of certain provisions of the Constitution of the State.

By Art. 9, sec. 2, it is provided that there shall be an Adjutant General, appointed by the Governor, by and with the advice and consent of the Senate ; and that "he shall hold his office *until the appointment and qualification of his successor,* or until removed in pursuance of the sentence of a Court-martial."

By Art. 2, sec 10, defining the powers of the Governor, it is declared that he shall nominate, and, by and with the advice and consent of the Senate, appoint all civil and military officers of the State, whose appointment or election may not be otherwise provided for ; and by sec. 11 of the same Article, it is provided that in case of any vacancy, during the recess of the Senate, in any office which the Governor has power to fill, he shall appoint some suitable person to said office, whose commission shall continue in force until the end of the next session of the Legislature, or until some other person is appointed to the same office, whichever shall first occur. And by sec. 15 of the same Article, the Governor has power to remove any military officer of the State, in pursuance of the sentence of a Court-martial.

The Adjutant General, prior to the adoption of the Constitution of 1851, held his office during good behaviour, removable only by sentence of a Court-martial. *Watkins vs. Watkins,* 2 *Md.,* 341. But, by the Constitution of 1851, Art. 9, sec. 2, it was provided that the Adjutant General should be appointed by the Governor, by and with the advice and consent of the Senate, and that he should hold his office for the term of six years. By the Constitution of 1864, Art. 9. sec. 3, while the Adjutant General was to be appointed by the Governor, with the concurrence of the Senate, he was to hold his office at the pleasure of the Governor.

It has been contended in this case, that, the appellant being rightfully in office, there was no power in the Governor, with the concurrence of the Senate, to remove him, except in the single event of conviction and sentence by Court-martial; and the argument in support of this position is mainly derived from the fact that the Convention which framed the present Constitution, declined to re-adopt the tenure of office that had been prescribed either by the Constitution of 1851, or that of 1864 ; and as it pre-

scribed no specific time for which the incumbent should hold, it must be supposed to have been the intention of the Convention to restore to the office the tenure by which it was held under the old Constitution of 1776, which was in force until superseded by the Constitution of 1851. But in this conclusion, from the best consideration we have been able to give the subject, we cannot agree.

It is true, the Constitution, by Art. 9, sec. 2, does not prescribe any certain or particular term for which the Adjutant General shall hold his office, but it has, we think, plainly designated the event and manner by which his holding shall terminate, and that is, the appointment and qualification of his successor. The Governor has no power, as he had under the Constitution of 1864, to remove the incumbent at his own mere will and pleasure; but with the concurrence of the Senate, a successor may be appointed, and upon the qualification of the appointee, the incumbent's right to hold will, *eo instanti*, terminate. This, we think, is the plain meaning of the Constitutional provision under consideration, for if it be not the meaning, it is difficult to conjecture the purpose for which the terms, "until the appointment and qualification of his successor" could have been employed. These terms, according to our understanding of the provision, were intended as terms of limitation, and to allow them any meaning at all, we must accept them as expressive of the event upon the occurrence of which the incumbent's right to exercise the functions of the office shall cease. They refer to no preceding tenure or limitation, and they must be taken, by their own force, as prescribing the tenure by which the office was to be held.

According to this Constitutional provision, there are two modes by which the Adjutant General may be removed from or superseded in his office, the first is, the appointment by the Governor, with the concurrence of the Senate, of a successor; and the second is, on conviction and sen-

tence of a Court-martial.   In regard to the first of these, the appointment and qualification of a successor operate immediate removal ; while the second, that of conviction and sentence of Court-martial, only form the basis or justification for the action of the Governor in removing the incumbent, under section 15, of Art. 2 of the Constitution.   It is there that the Constitution has provided for removal of the incumbent both during the session and the recess of the Senate.   During the session of the Senate the removal may be effected by the nomination and confirmation of a successor, while during the recess, in pursuance of a sentence of a court-martial, the Governor alone has the power of removal ; and upon such removal he has power, under sec. 11, of Art. 2, to fill the vacancy thus created, until the end. of the next session of the Senate, or until another appointment be made as authorized by the Constitution.

. It is plainly manifest that it was the design of the framers of the Constitution to change the tenure of the office from what it.had been under the preceding Constitution of 1851 and 1864, to some different limitation ; but if it had been their purpose to restore the life tenure, such as existed under the old Constitution of 1776, as contended by the appellant, we must suppose that apt and appropriate terms would have been employed to express that intent, especially as there was a familiar formula at hand, ·in respect to which there was no ambiguity.   It would be by mere implication, and that without any intrinsic evidence of an intention on the part of the framers of the Constitution, that there could be predicated of the terms used a life tenure in the office.   Instead of declaring that the incumbent should hold his office during life or good ·behaviour, or for a specific term of years, or at the pleasure of the Governor, as by former Constitutions, it was declared that he shall hold *until* the appointment and qualification of his successor, *or* until removed in pursuance of the sentence of a Court-martial.   These terms, while they

do not expressly declare that the Governor shall have power, with the concurrence of the Senate, to remove the incumbent, do, by the strongest possible implication, declare that such power shall exist, and that, upon its exercise, the right of the incumbent to hold the office shall thereby terminate and give place to the right of the new appointee. It was certainly competent to the Convention to fix such limitation to the holding of the office, and, from the language employed, we conclude such to have been the intention.

In the course of the argument, it was strongly urged that such construction should not be adopted, if any other could be maintained, as thereby the incumbent of the office would be subject to causeless and unwarranted removal by the executive. But in answer to this it may be said, that, in the organization of government, confidence must be reposed somewhere, and that no more effectual check could well be imposed upon the undue exercise of the Governor's power over this office than has been imposed, by requiring the concurrence of the Senate before removal can be accomplished. The Governor and the Senate are alike the immediate representatives of the people, and whatever they do in their official capacity, they do under a solemn responsibility to their constituents. The Courts have no right to assume that there has been or will be any undue and improper exercise of power by a co-ordinate branch of the Government.

Having concluded that there was power in the Governor, with the concurrence of the Senate, to supersede the appellant in office by the appointment of a successor, it becomes unnecessary for us to consider the question of the supposed disqualification of the appellant, under the XIVth amendment to the Constitution of the United States.

It follows that the judgment appealed from must be affirmed.

*Judgment affirmed.*

(Decided 1st July, 1874.)